UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
ROBERTO STOUTE,

                             Plaintiff,

       vs.

The CITY OF NEW YORK,
NEW YORK CITY POLICE OFFICERS
DET. RICHARD ALTAMIRANO,
DET. RICHARD MCLEES,
SGT. JASON STOCKER,
and JOHN DOES 1-7
in their individual and official capacities,

                          Defendants.
---------------------------------------------------------------x

**FIRST AMENDED COMPLAINT**

**18 cv 5004 (AKH) (HBP)**

**ECF Case**

**JURY TRIAL DEMANDED**

Plaintiff Roberto Stoute, by his attorney, Cyrus Joubin, complaining of the Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.   This action arises from various civil rights violations against Roberto Stoute ("Plaintiff") by New York City police officers.  Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983") against the individual defendants for illegal search, false arrest, excessive force, unlawful strip search, denial of the right to a fair trial, failure to intervene, and a *Monell* claim against the City of New York for the same constitutional violations.  Additionally, Plaintiff asserts analogous claims under New York Law against the individual defendants, and against the City of New York under the doctrine of *respondeat superior*.  Plaintiff seeks

compensatory and punitive damages, costs, disbursements, and attorney's fees pursuant to applicable state and federal civil rights law.

## JURISDICTION

2.   This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

3.   Plaintiff further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy which gives rise to the federally based claims and causes of action.

## VENUE

4.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

## JURY DEMAND

5.   Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.   The individually named defendants Detective Richard Altamirano (Shield # 2152) ("Det. Altamirano"), Detective Richard McLees (Shield # 4478) ("Det. McLees"), Sergeant Jason Stocker (Shield # 3041) ("Sgt. Stocker"), and Police Officers John Does

1-7 ("PO Doe 1," "PO Doe 2," etc.) (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

7.      On the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD Narcotics Borough Manhattan South.

8.      Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law, in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

9.      Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

<b><u>NOTICE OF CLAIM</u></b>

10.     Plaintiff served a Notice of Claim on the Comptroller of the City of New York within ninety days of the incident, being assigned Claim # 2017PI017447.  At least 30 days have elapsed since the service of the Notice of Claim, and adjustment and payment has been neglected or refused.

11.     The City of New York demanded a hearing pursuant to General Municipal Law § 50-h, which hearing was held on August 30, 2017.

12.     This action has been commenced within one year and ninety days after the occurrence of the event upon which the claims are based.

<b><u>STATEMENT OF FACTS</u></b>

13.     In the early morning hours of March 23, 2017, Plaintiff was sleeping in his room in Bellevue Men's Shelter, located at 400 East 30th Street in Manhattan.

14.     Around 6:00 a.m., Plaintiff was woken up and surrounded by a group of NYPD officers in plain clothes, including Det. Altamirano, Det. McLees, and the other individual defendants.

15.     One of the individual defendants got on top of Plaintiff and started punching him in the presence of the other officers.

16.     When Plaintiff asked what was happening, the officer who had punched him said, "Shut the fuck up, nigger – you know why we're here."

17.     Plaintiff was startled and confused – he did *not* know why these police officers were in his room – but he did not threaten, fight, or resist any of the officers.

18.     The officers placed Plaintiff under arrest, handcuffing him behind his back.

19.     The officers then began searching Plaintiff's belongings in his room, including in his locker.

20.     Nothing unlawful was found in Plaintiff's belongings.

21.     While standing in the hallway outside Plaintiff's room, officers patted down Plaintiff and found nothing unlawful on him.

22.     As they searched through Plaintiff's property, the officers found jewelry and cash.

23.     The individual defendants who raided and searched Plaintiff's room stole one of Plaintiff's bracelets and around $2,500 cash belonging to Plaintiff.

24.     The individual defendants took Plaintiff to a police van and transported him to a police precinct.

25.     The ride in the van was rough and bumpy, causing Plaintiff to bang his head against the metal walls in the van.

26.     At the precinct, three of the individual defendants – upon information and belief, Det. Altamirano, Det. McLees, and Sgt. Stocker – took Plaintiff to a bathroom and subjected him to a body cavity search.

27.     When the three officers first ordered Plaintiff to take off all his clothes to be strip-searched, Plaintiff declined to do so.

28.     Plaintiff's refusal to take off his clothes led the officers to strike him several times.

29.     After being struck, Plaintiff complied with the officers' order to remove his shorts and underwear.

30.     After Plaintiff took off his underwear and was naked, he was ordered to face a wall and bend over.

31.     Plaintiff complied with this order.

32.     After Plaintiff bent over, one of the three officers used his hands to spread open Plaintiff's buttocks and looked to see if any contraband was hidden therein.

33.     Nothing unlawful was found on or in Plaintiff's person.

34.     At no point prior to this body cavity search did any of the individual defendants see Plaintiff conceal or attempt to conceal anything in his buttocks or anywhere else on his body.

35.     At no point prior to the body cavity search were any of the individual defendants informed that Plaintiff concealed, or attempted to conceal, anything in his buttocks or elsewhere on his body.

36.     At the precinct, Plaintiff was fingerprinted and photographed, booked and processed, and locked in holding cells.

37.     The individual defendants claimed that they had a warrant to raid Plaintiff's room and search his property, but they never showed him any warrant.

38.     If there was in fact a warrant, the target of the warrant was someone other than Plaintiff.

39.     At the precinct, Det. Altamirano and Det. McLees concocted the false story that Plaintiff was in possession of crack/cocaine residue.

40.     Det. Altamirano and Det. McLees then forwarded that false story to the New York County District Attorney's Office.

41.     After being detained in the precinct, Plaintiff was transported to Central Booking in lower Manhattan where he was further detained in holding cells.

42.     On the evening of March 23, 2017, Plaintiff was arraigned on Docket 2017NY017592 in New York County Criminal Court, charged with one count of Criminal Possession of a Controlled Substance in the Seventh Degree, a class "A" Misdemeanor.

43.     According to the Criminal Court Complaint – sworn to by Det. Altamirano – Plaintiff was in possession of "two razors containing crack/cocaine residue" and "a scale containing crack/cocaine residue" that were found in his "locker assigned by Bellevue."

44.     The judge at Plaintiff's arraignment released him on his own recognizance but ordered him to return on a future date to Criminal Court at 100 Centre Street, Part B.

45.     On June 15, 2017, after several court appearances, Plaintiff accepted an Adjournment in Contemplation of Dismissal.

46.     On December 14, 2017, the prosecution against Plaintiff was dismissed and sealed.

47.     As a result of the above-described assaults by the individual defendants, Plaintiff suffered substantial pain and physical injury for which he required medical treatment and physical therapy.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

48.     All of the aforementioned acts of the individual defendants, their agents, servants and employees, were carried out under the color of state law in the course and scope of their duties.

49.     All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

50.     The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

**FAILURE TO TRAIN AND SUPERVISE**

51.     Upon information and belief, the individual defendants' aforementioned abuse of power – in the forms of physical violence and mendacity – was not an isolated event. There were other instances of misconduct by the individual defendants that Defendant City knew or should have known about.

52.     The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would

engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

**NYPD'S CULTURE OF MENDACITY**

53.     There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

54.     The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes a destructive custom and policy that fosters a culture of mendacity in the NYPD.

55.     The City has recognized the obvious and significant problem of police officers fabricating criminal charges, but there is no serious mechanism in place by which to curb such conduct or weed out dishonest officers.

56.     The NYPD has no internal programs – not even rudimentary statistical software – that enable it to assess whether a particular Officer or Detective has an unusually high number of allegations of making false statements.

57.     Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.

58.     But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on court documents.

59.     The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

**THE NYPD'S SHAM FALSE STATEMENT POLICY**

60.     In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.  The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

61.     Since its inception, the Commission has emphasized the importance of appropriately disciplining officers who make false statements.  On the basis of the Commission's recommendations, the NYPD has adopted a False Statement Policy (*see* NYPD Patrol Guide Section 203-08) that mandates termination of officers who intentionally make false official statements regarding a material matter, unless exceptional circumstances exist.

62.     As the Commission stated in its 2013 Annual Report, "Consistent application of the false statement policy is of utmost importance.  It not only enables members of the service to know what they can expect if they make false statements, but it also sends a clear message to members of the service, as well as the public, that the Department will not tolerate such conduct" (pg. 74).

63.     The Commission analyzes false statements in official criminal court documents, including supporting depositions, criminal court complaints, summonses, and affidavits.  False statements in such documents are of paramount importance because they have the potential to unjustly deprive citizens of their civil liberties and to destroy the lives of innocent people.

64.     Despite the importance of appropriately identifying and punishing officers

who make false statements, the NYPD rarely imposes discipline consistent with its stated policy of terminating officers.

65.     Indeed, the gap between its practice and policy is so wide as to make the NYPD's False Statement Policy a sham.

66.     For example, in the 2014 Annual Report, the Commission examined ten cases involving false statements in sworn court documents; in seven of those cases, the subject officers were found guilty by making false statements but not separated from the police department.

67.     Such findings – which expose the gap between the NYPD's False Statement Policy and practice – can be found in virtually every Annual Report issued by the Commission.

68.     Over the past ten years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD "fail[s] to follow its false statement policy"; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively skirts the requirement of termination without justification.

69.     And there is no sign of improvement.  Indeed, under Mayor de Blasio's administration, the NYPD seems more empowered than ever to thumb its nose at the False Statement Policy.

70.     In its 2015 Report, the Commission found that the NYPD rarely brought charges under the False Statement provision.  "Instead," the Commission reports, "the Department used other Patrol Guide sections to allege misconduct relating to false

statements" (pg. 103) – sections which do not carry a presumption of termination.

71.     The Commission's 2017 Report found that the NYPD has been charging officers with making false official statements in far fewer instances than facts and circumstances seem to warrant.

72.     In the specific context of fabricated court documents that falsely accuse people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

73.     To make matters worse, the instances of false statements investigated by the IAB and analyzed by the Commission compose a small fraction of the total instances of false statements that occur within the NYPD.

74.     In the 2010 Annual Report, for instance, the Commission identified only ten IAB cases that included allegations of making an official false statement.

75.     The officers who were caught fabricating statements were unlucky – they were captured on videotape, a civilian reported them, their lies were unwittingly exposed – but most dishonest police officers know they can lie and get away with it.

**"TESTILYING"**

76.     On March 18, 2018, the New York Times published an article by Joseph Goldstein called "'Testilying' by Police:  A Stubborn Problem," detailing the pervasive and largely ignored problem of police perjury.  "Behind closed doors, we call it testilying," said NYPD officer Pedro Martinez in an interview for the article.

77.     The article states:  "An investigation by the New York Times found that on more than 25 occasions since January 2015, judges or prosecutors determined that a key

aspect of New York City police officer's testimony was probably untrue.  The Times identified these cases – many of which are sealed – through interviews with lawyers, police officers and current and former judges."  Moreover, "[t]he 25 cases identified by The Times are almost certainly only a fraction of those in which officers have come under suspicion for lying in the past three years."  "Still, the cases identified by The Times reveal an entrenched perjury problem several decades in the making that shows little sign of fading."  The purpose of the perjury was "aimed at tilting the scales toward guilt."

**NYPD PROTECTS AND PROMOTES LYING OFFICERS**

78.     On March 19, 2018, the New York Times published another article by Joseph Goldstein entitled "Promotions, Not Punishments, for Officers Accused of Lying," reiterating the findings of the Commission and detailing a "culture of dishonesty."

79.     The article states:  "Of the 81 cases in which a civilian review board [the CCRB] found an officer had lied, the Police Department pursued 'false statement' charges in only two."  In the other 79 cases, the NYPD found no wrongdoing or found the officer guilty of lesser misconduct.

80.     The article also notes a problem with transparency and accountability when it comes to the NYPD's false statement policy:  the NYPD is not required to tell the CCRB if it takes action against lying police officers.  Thus, while the CCRB is aware of the 81 cases it has tracked since 2010, it – along with the public at large – is oblivious to the total number of cases in which officers have been found to lie and what their punishments are.

81.     So while the NYPD may publicly extol its professionalism and integrity

control, the NYPD cannot be trusted.  Its indifference to truthfulness by its own rank and file – coupled with a lack of full transparency about how it handles lying officers – makes the department as a whole unworthy of trust.

**FAILURE BY THE CITY TO FIX THE CULTURE OF MENDACITY**

82.     Defendant City has turned a blind eye to the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; and has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

83.     Defendant City has no system by which to proactively identify mendacious officers.  It waits for civilians to bring such officers to its attention.

84.     In the ten years prior to March 23, 2017, the number of NYPD investigations into police officers making false statements on criminal court accusatory instruments that did not arise from civilian complaints was *zero*.

85.     In a criminal justice system where numbers and statistics have become paramount, the inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals."

86.     Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

87.     Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers, such as the individual defendants.

88.     Through the data cited herein along with hundreds of civil rights lawsuits alleging fabrication every year, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the fabrication of criminal charges.

89.     By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its citizens.

90.     The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice, which is rooted in truth and fact, has become subverted and degraded.

91.     Consequently, police officers must operate in a police culture so truth-sick and cynical that their morale and morality are crushed.

92.     NYPD officers see firsthand how roguish and dishonest behavior is rewarded within their ranks.  The negative incentives created by this sick culture threaten the safety, welfare, and liberty of every citizen.

**NYPD'S STRIP SEARCH POLICY**

93.     Moreover, there has been an over-aggressive and illegal strip search policy in the NYPD Narcotics Division, a policy that favors strip-searching even low-level, non-criminal marijuana possessors, and other mere possessors of drugs.

94.     If the aggressive strip-searching is not an explicit policy of the NYPD's Narcotics Division, then it is a rampant and recklessly tolerated practice, well-documented, widely reported, flagrantly abused, sadistically embraced as a humiliating practice that rarely bears fruit.

95.     Since 2014, Plaintiff's lawyer alone – Cyrus Joubin – has filed and settled six other lawsuits in the Southern District of New York against detectives from the NYPD Narcotics Borough claiming illegal anal cavity searches on the plaintiffs.

96.     Those lawsuits – all of which settled with the illegal strip search claims intact – included <u>Lorenzo v. City of New York, et al.</u>, 14 cv 9865 (ALC); <u>Siler v. City of New York, et al.</u>, 15 cv 189 (ER); <u>Beverly v. City of New York, et al.</u>, 15 cv 2315 (GHW); <u>Ramirez v. City of New York, et al.</u>, 15 cv 1589 (PAE); and <u>Williams v. City of New York, et al.</u>, 15 cv 8008 (DLC).  In <u>Ortiz v. City of New York</u>, 16 cv 2922 (LTS), plaintiff Ortiz accepted a Rule 68 Offer of Judgment.

97.     In none of those cases was any contraband discovered in the plaintiffs' body cavities.

**DAMAGES**

98.     As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

    a.  Violation of his constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;

    b.  Physical injury;

    c.  Severe emotional trauma, distress, degradation, and suffering.

<u>**SECTION 1983 CLAIMS**</u>

<u>**FIRST CLAIM**</u>

**Illegal Search Under Section 1983**

99.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

100.    By the actions described, the Defendants deprived Plaintiff of his Fourth
Amendment right to be free of unreasonable or unwarranted restraints on personal liberty,
specifically his right to be free from unlawful searches.

101.    The defendant officers searched Plaintiff's room, where he had a reasonable
expectation of privacy, without a valid search warrant.

102.    As a direct and proximate result of the misconduct and abuse of authority
detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### Illegal Strip Search Under Section 1983

103.    Plaintiff realleges and reiterates all allegations set forth in the preceding
paragraphs as if stated fully herein.

104.    By the actions described, the Defendants deprived Plaintiff of his Fourth
Amendment right to be free of unreasonable or unwarranted restraints on personal liberty,
specifically his right to be free of unlawful searches of his person.

105.    The body cavity search of Plaintiff – an extreme invasion of privacy and
bodily dignity – took place without probable cause to believe that a weapon or
contraband was secreted in his anus.

106.    As a direct and proximate result of the aforementioned conduct of the
individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### Denial of the Right to a Fair Trial Under Section 1983

107.    Plaintiff realleges and reiterates all allegations set forth in the preceding
paragraphs as if stated fully herein.

108.    By the actions described, the Defendants deprived Plaintiff of his Fourth,
Fifth, and Fourteenth Amendment rights to a fair trial.

109.    The individual defendants deliberately forwarded fabricated information to the
Manhattan District Attorney's Office (namely, the alleged discovery of crack/cocaine in
Plaintiff's room).

110.    As a direct and proximate result of the aforementioned conduct of the
individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### Excessive Force Under Section 1983

111.    Plaintiff realleges and reiterates all allegations set forth in the preceding
paragraphs as if stated fully herein.

112.    By the actions described, the individual defendants deprived Plaintiff of his
Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal
liberty, specifically his right to be free from excessive and unreasonable force.

113.    As a direct and proximate result of the aforementioned conduct of the
individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### False Arrest Under Section 1983

114.    Plaintiff realleges and reiterates all allegations set forth in the preceding
paragraphs as if stated fully herein.

115.    Plaintiff realleges and reiterates all allegations set forth in the preceding
paragraphs as if stated fully herein.

116.    By the actions described above, Defendants deprived Plaintiff of his federal civil rights, including his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free from false arrest.

117.    As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

118.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

### Failure to Intervene Under Section 1983

119.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

120.    Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other law enforcement officers.

121.    The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of his constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

122.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SEVENTH CLAIM

### Municipal Liability Under Section 1983

123.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

124.     By the actions described, the Defendant City deprived Plaintiff of his Constitutional rights through its failure to train, supervise, and discipline malicious and mendacious officers; through its indifference to a culture of dishonesty among those who wield considerable power over the lives of everyday citizens; and through its tolerance of illegal body cavity searches by NYPD officers.

125.     As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged.

### PENDENT STATE CLAIMS

### FIRST CLAIM

### False Imprisonment under N.Y. State Law

126.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

127.     The individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, and without privilege or consent.

128.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

### SECOND CLAIM

### Unreasonable Search and Seizure Under New York State Constitution Art. I § 12

129.     Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

130.     Article 1, Section 12, of the New York State Constitution declares the right to be free from unreasonable searches and seizures.

131.    Without probable cause and without Plaintiff's consent, the individual defendants arrested Plaintiff, searched his person and residence, took his property, confined him, illegally strip searched him, and initiated false charges against him.

132.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### Larceny Under N.Y. State Law

133.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

134.    As detailed above, the individual defendants intentionally stole Plaintiff's property.

135.    As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### Battery Under N.Y. State Law

136.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

137.    As detailed above, the individual defendants intentionally touched Plaintiff in an offensive and harmful manner, and they intentionally subjected him to offensive and harmful contact.

138.    As a direct and proximate result, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

**Negligent Hiring/Training/Retention of Employment Services Under N.Y. State Law
(Against Defendant City of New York)**

139.    Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

140.    Defendant City owed a duty of care to Plaintiff to prevent the unlawful search,

false arrest, battery, fabrication of evidence, and mental and emotional abuse sustained by

Plaintiff.

141.    Upon information and belief, all of the individual defendants were unfit and

incompetent for their positions.

142.    Defendant City knew or should have known through the exercise of

reasonable diligence that the individual defendants could potentially cause harm.

143.    Defendant City's negligence in hiring, screening, training, disciplining and

retaining the individual defendants proximately caused Plaintiff's injuries.

144.    As a result of its negligent conduct, Defendant City has directly and

proximately caused the damages and injuries hereinbefore alleged.

## SIXTH CLAIM

**Respondeat Superior Under N.Y. State Law**

145.    Plaintiff realleges and reiterates all allegations set forth in the preceding

paragraphs as if stated fully herein.

146.    Defendant City is the employer of the individual defendants.

147.    Under the doctrine of *respondeat superior*, the Defendant City is responsible

for the wrongdoing of its employees acting within the scope of their employment – in this

case, the false imprisonment, battery, fabrication, larceny, and unreasonable search and seizure committed by the individual defendants against Plaintiff.

148.    As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.    An order awarding compensatory damages for Plaintiff Roberto Stoute in an amount to be determined at trial;

b.    An order awarding punitive damages in an amount to be determined at trial;

c.    A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is entitled to reasonable attorney's fees, costs and disbursements; and

d.    Such other and further relief as this Court may deem appropriate.


DATED:      December 5, 2018              _____/s/_____
            New York, New York           CYRUS JOUBIN, ESQ.
                                          43 West 43rd Street, Suite 119
                                          New York, NY 10036
                                          (703) 851-2467
                                          joubinlaw@gmail.com
                                          Attorney for Roberto Stoute